December 27, 1979

## 79-89 MEMORANDUM OPINION FOR THE DEPUTY ASSISTANT ATTORNEY GENERAL, LAND AND NATURAL RESOURCES DIVISION

### Naval Petroleum Reserves (10 U.S.C. § 7426)— Settlement of *United States* v. *Standard Oil Co. of California* (9th Cir. No. 78-1565)

This responds to your request for our opinion whether 10 U.S.C. § 7426 precludes a settlement of the above-captioned case, in which Standard Oil Co. of California (Standard) would be guaranteed current receipt of more than its percentage share of oil from Naval Petroleum Reserve No. 1 at Elk Hills, Kern County, California, (the Elk Hills reserve), during the present period of maximum production. We concluded in an earlier memorandum that the statute would bar such a settlement. We now confirm our earlier conclusions.

### I. Background

Your inquiry arises in the context of settlement negotiations between the United States and Standard over the terms for including within the Elk Hills reserve certain land adjoining the reserve. That land had been developed independently by Standard before the United States sought, and was granted, an injunction against independent production pending determination of the terms and conditions for including the land within the reserve. The Secretary of the Navy concluded that Standard should receive an amount of oil as compensation for including the land in the reserve, but that this amount should not be received until the expiration of the present period of maximum production of the reserve (authorized for 6 years by Title II of the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, 90 Stat. 303, 307, 10 U.S.C. § 7422(c)(1)(B)). The U.S. district court, on November 4, 1977, ruled that Navy's determination that the land should be included within the reserve was binding on Standard and that the proposed terms and conditions were fair and equitable. Standard appealed that decision, and oral argument before the U.S. Court of Appeals for the Ninth Circuit was held in September, 1979.

The present issue concerns the legality of settlement terms under consideration that would, *inter alia,* guarantee to Standard receipt currently of an amount of oil that would exceed the share of oil to which it is entitled on the basis of its ownership interest in the reserve. After inclusion in the reserve of the land of concern here, the United States would own some 80 percent of the oil in the producing zone, and Standard would own some 20 percent. The question presented is thus whether § 7426 bars Standard, in circumstances of maximum production, from receiving currently more than 20 percent of the zone's production and, therefore, bars any settlement that would surpass the 20 percent figure.

## II. Discussion

The Act of June 17, 1944, 58 Stat. 280, authorized the United States and Standard to enter into a unit plan contract for the development of naval petroleum reserves, including the one at Elk Hills. To protect the interests of the United States, Congress provided that any unit plan contract must require that the United States be assured of receipt currently of its share of the total production. The pertinent provision is as follows:

*Any contract* entered into pursuant to the authority granted in the preceding paragraph for joint, unit, or other cooperative plan of exploration, prospecting, conservation, development, use, or operation *shall require that the United States be assured of receipt currently of its share of the total production from each of the various commercially productive zones underlying all lands covered by the contract* as determined from time to time on the basis of estimates of its original share of the quantities of recoverable oil, gas, natural gasoline and associated hydrocarbons in such zones underlying such lands on the date fixed in such contract: *Provided, however, That any party to such a contract,* other than the United States *may,* pursuant to the authority hereinabove granted to use and operate the reserves for their protection, conservation, maintenance and testing, *be permitted under the terms of such contract to have produced and to receive and shall have charged to its share in the total production from any zone or zones such quantities of petroleum as are necessary to compensate it—*

(a) *for its share of the current expenses* of protecting, conserving, testing and maintaining in good oil-field condition such lands and the wells and improvements thereon, *and its real and personal taxes* levied or assessed thereon; *and*

(b) *for surrendering control of the rate of production from its lands: Provided,* That if the Secretary of the Navy is not then causing petroleum to be produced pursuant to a joint resolution as referred to in the preceding paragraph, the quantity of petroleum determined to be produced under this subparagraph (b) may, in the absolute discretion of the Secretary, be terminated or reduced at any time on reasonable notice.

483

Such quantities permitted to be produced pursuant to the foregoing subparagraphs (a) and (b) shall in no event, however, exceed one-third of its share of the estimated recoverable petroleum on such date fixed in such contract shall be entered into without prior consultation in regard to all its details with the Naval Affairs Committees of the Congress.[1] [Emphasis added.]

The statutory requirement that the United States shall "be assured of receipt currently of its share of the total production from each of the various commercially productive zones underlying all lands covered by the contract" on its face would preclude a settlement in a period of maximum production that would permit Standard to receive currently more than its share of total production in the zone. For if Standard were guaranteed such receipt, then the United States could not be assured of receipt currently of its full share of the total maximum production.

In response, Standard argues that the current receipt principle does not govern absolutely because the statute includes the proviso that any party other than the United States may be permitted to receive oil as necessary to compensate it for its share of current expenses and taxes, and for surrendering control of the rate of production. Standard contends that the proviso carves out two broad exceptions to the current receipt principle. Thus, if, in a hypothetical case, 100 barrels per day are produced from zone X in a period of maximum production, and if 10 barrels would compensate Standard for current expenses and taxes and 10 additional barrels would compensate Standard for surrendering control over the rate of production, then, Standard contends, only 80 barrels must be divided currently between Standard and the United States in accordance with their respective ownership shares.

The first problem with this interpretation is that the current receipt principle is stated in unambiguous language providing that each contract must guarantee "that the United States be assured of receipt currently of its share *of the total production* from each of the various commercially productive zones underlying all lands covered by the contract * * * ." [Emphasis added.] Standard seeks to add a gloss to the statute that in effect would nullify Congress' use of the word "total."

---

[1] 58 Stat. 280, 281. This provision was codified in 1956 at 10 U.S.C. § 7426(b), (c) and (d). The legislative history of the 1956 codification makes it plain that no substantive change in the 1944 statute was intended. See Report of the House Judiciary Committee on the revision of title 10, U.S. Code, Armed Forces, and title 32, U.S. Code, National Guard, H. Rept. 970, 84th Cong., 2d sess. 19, reprinted at 1956 *U.S. Code Cong. & Admin. News* 4613, 4620 ("[t]he object of the new titles has been to restate existing law, not to make new law. Consistently with the general plan of the United States Code, the pertinent provisions of law have been freely reworded and rearranged, subject to every precaution against disturbing existing rights, privileges, duties, or functions"); see also the Senate Judiciary Committee Report, S. Rept. 2484, 84th Cong., 2d sess., reprinted at *id.* 4632, 4640. See generally, *Muniz* v. *Hoffman,* 422 U.S. 454 472-74 (1975); *Tidewater Oil Co.* v. *United States,* 409 U.S. 151, 162 (1972); *Fourco Glass Co.* v. *Transmirra Products Corp.,* 353 U.S. 222, 227 (1957).

Also, in a period of maximum production, to allow Standard to receive currently, in addition to its percentage share amounts of oil, both for costs and taxes and for surrendering control over the rate of production would be most unusual. Ordinarily, it is expected that an oil producer will meet its operating expenses by selling what it owns, and that it will not receive an increment in addition to what it owns in order to pay such expenses. Standard implicitly suggests that Congress did not accept that normal understanding. In view of the statute's plain language, we are necessarily reluctant to reach such a result.

Standard relies primarily on a passage in the report of the House Committee on Naval Affairs, H. Rept. 1529, 78th Cong., 2d sess. 11–12 (1944), which speaks of "two permissible exceptions" to the current receipt principle in the following terms:

> The basic principles sought to be embodied in the foregoing new second paragraph are that any joint, unit, or cooperative contract with respect to reserve No. 1 must provide, first, that the question of drainage be solved by means of the ultimate receipt by the United States of its proper share of the oil underlying the lands covered by the contract on the date fixed in the contract, and, second, that the United States receive currently its proper share of the oil as it is produced from the lands covered by the contract. To this second principle, however, *there are two permissible exceptions:* One is that a private party to the contract may produce, receive, and have charged to its share in the total oil in the field sufficient oil to reimburse it for its share of the field-maintenance expenses and the real and personal property taxes levied against it in respect of its lands and the improvements thereon; the other is that a private party to the contract may have a right to have produced and to receive and have charged to its share in the total oil in the field an agreed amount of oil representing one of the considerations moving to it for its agreement under the contract to surrender to Navy control over the rate of production from its lands.
>
> It is to be particularly noted that *the oil which the contract may call for to be produced and allotted in accordance with the two exceptions is expressly referred to in the new second paragraph as produced under the authority,* contained in the first paragraph and discussed above, *for the use and operation of the reserves for their protection, conservation, maintenance, and testing.* The theory behind this approach is that the contract is entered into for the main purpose of securing protection by the elimination of drainage and the enhancement of conservation by the acquisition of control over the time and rate of production from the private lands. Accordingly, the production provided for under paragraphs (d) and (f) of section 5 of the proposed unit plan contract with Standard does not depend upon any finding

of need for national defense purposes nor any joint resolution of the Congress. Rather, *it is produced under the authority of the protecting power and represents an allowance of a part of Standard's share of the oil to Standard within the terms of the exceptions denominated (a) and (b) in the new second paragraph of the act.* [Emphasis added.]

To understand the foregoing passage, it must be recognized that the statute contemplated two different situations concerning production of the Reserves: "shut-in" periods during which only enough oil to maintain the Reserves would be produced, and "open-up" periods during which fuller production would be required to meet needs of national defense[2] In the former situation, there would be a need to protect the interests of an entity in Standard's position by guaranteeing it sufficient production to meet its current expenses and taxes and compensate it for surrendering control over the rate of production. As noted in the foregoing passage from the House Committee report, oil produced "in accordance with the two exceptions is * * * produced under the authority * * * for the use and operation of the reserves for their protection, conservation, maintenance, and testing"—that is under the authority of a shut-in period. The fact that the current receipt principle has "two permissible exceptions" in such a period does not determine the result in the present case, for the reserve is in a period of "open-up," or maximum, production.

In our view, the "two permissible exceptions" language in the House Committee report merely confirms that, in a shut-in period in which production otherwise would likely be so low as to make it impossible to compensate Standard for current costs and taxes and for surrendering control over the rate of production, Standard is protected by an authorization of

---

[2]As stated in the Report of the House Committee on Naval Affairs, H. Rept. 1529, 78th Cong., 2d sess. 6–7 (1944):

It is to be noted that the clause as so amended contemplates two separate situations when oil may be produced from the reserves. The first is for a protective purpose, the existing power being continued but with the clarifying words 'conservation, maintenance, and testing' added in order to make it clear that this power to produce includes production which will contribute to over-all conservation in the ground and also production for proper field maintenance * * * . It is the intention of the bill that the Secretary in his discretion and without the necessity of further congressional authorization than is provided by this provision of the act itself, may produce oil or cause oil to be produced—

for the protection, conservation, maintenance, and testing of the aforesaid reserves * * * .

The second situation in which oil may be produced under the amended clause is—

whenever and to the extent the Secretary, with the approval of the President, finds required for the national defense * * * .

In this case, however, the bill provides that there shall be no production pursuant to such a finding unless and until the Congress shall first have authorized it by joint resolution.

production sufficient for those needs.[3] As Chairman Vinson, the Act's principal draftsman, stated:

> When the war needs cease to exist, then the fields will be shut down, except for the protection of the field and to enable Standard to produce enough to earn its taxes out of the reserve, and to pay for giving up control over all of its lands.[4]

However, a different situation is presented when the reserve is in a period of maximum production. In such a circumstance, the legislative history confirms the conclusion, based on the statute's language, that Congress expected that the United States would receive currently its percentage share of oil from the reserve. Assistant Secretary of the Navy Bard testified to this effect before the Senate Committee on Naval Affairs shortly before the Congress passed the 1944 Act:

> I think I can explain so that you get the whole picture perhaps. The Navy will produce oil for war purposes, it never will produce except for an emergency. It wants to keep its oil in the ground. *When it is producing for war purposes, the scheme is to divide the oil between Navy and Standard in the ratios of their interests in the oil in the ground,* that is, 64 percent and 36 percent. When it is not producing for war purposes, the Navy produces nothing. All production then is to cover the costs of Standard and their taxes plus a certain amount of oil, subject to the discretion of the Secretary, to compensate them for turning over all control of their property to the Navy.[5] [Emphasis added.]

Accordingly, Congress understood that, in an open-up situation, the current receipt principle governs. However, in a shut-in period, Standard could receive more oil than the United States on a current basis for expenses, taxes, and surrendering control over the rate of production; the United States would simply conserve its current share in the ground.[6]

---

[3]There are two statutory qualifications on Standard's receipt of oil for costs and taxes and for compensation in a shut-in situation. First, in order to protect the Government's interest of preserving oil in the ground, the Secretary was provided ultimate discretion in such a period to reduce or even to terminate the flow of oil to Standard as compensation for surrendering control over the rate of production. Second, Standard could not receive over time more than one-third of its total recoverable oil in a zone for current costs and taxes and for compensation in order that the bulk of Standard's oil and Navy's oil would be preserved in the ground.

[4]Naval Petroleum Reserves, Hearing before the Committee on Naval Affairs, United States Senate, on S. 1773, 78th Cong., 2d sess. 13 (1944); *see also* S. Rept. 948, 78th Cong., 2d sess. 4 (1944).

[5]Naval Petroleum Reserves, Hearing before the Committee on Naval Affairs, United States Senate, on S. 1773, 78th Cong., 2d sess. 19 (1944).

[6]The United States would still be assured of receiving currently its percentage share should that become necessary.

In sum, on the basis of the statute's plain language and its legislative history, we cannot accept Standard's interpretation. Section 7426 does bar a settlement under which, in a period of maximum production, Standard would be guaranteed receipt of more than its percentage share of oil from Naval Petroleum Reserve No. 1.[7]

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[7] In response to Standard's suggestion that it is unfair to limit it to its percentage share of oil in the present open-up period, we note that such a contention is undermined by the district court's finding in this case that "the terms offered by the Navy were 'fair and equitable.' " Memorandum Opinion of November 4, 1977, 4.